## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| **KAREN A. GARCEAU on behalf of the Embry-Riddle Aeronautical University DC Retirement Plan, individually and as a representative of a class of participants and beneficiaries,**<br><br>   **Plaintiff,**<br><br>**vs.**<br><br>**EMBRY-RIDDLE AERONAUTICAL UNIVERSITY, INC.,**<br><br>   **Defendant.** | **CASE NO:** |

## CLASS ACTION COMPLAINT

On behalf of the Embry-Riddle Aeronautical University DC Retirement Plan ("Plan"), Karen A. Garceau ("Plaintiff") file this Class Action Complaint against Defendant Embry Riddle Aeronautical University, Inc. ("University" or "Defendant"), for breaching its fiduciary duties in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

## BRIEF OVERVIEW

1. Defendant offers a retirement plan to its employees under 26 U.S.C. § 403(b). Eligible faculty and staff members may elect to participate in the Plan, which provides the primary source of retirement income for many former

employees. Plaintiff is a current Plan participants. The Plan has over 5,000 participants and more than $500 million in assets.

2.     Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which $5.6 trillion was held in 401(k) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).

3.     In a defined contribution plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

4.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and

diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.     Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees and performance compound and result in vast differences in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

6.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).

7.     As of December 31, 2022, the Plan had $495,777,816 in assets. Accordingly, the Plan has substantial bargaining power regarding compensation paid to third party service providers. However, instead of leveraging the Plan's tremendous bargaining power to benefit Plan participants and beneficiaries, like a prudent fiduciary would, Defendant over the relevant time period, chose poorly performing investments, inappropriate high-cost mutual fund share classes, and

caused the Plan to pay excessive compensation to the Plan's recordkeeper for routine administrative services.

8.      It is a fundamental duty of ERISA fiduciaries to select prudent investments for retirement plans and to defray expenses for the Plan. That is because individual plan participants cannot do this themselves. They must rely on plan fiduciaries to do so for them and the entire Plan.

9.      Defendant made no meaningful attempt to reduce the Plan's expenses or to prudently monitor and review the Plan's investment options. Defendant employed flawed and ineffective processes, which failed to ensure that: (a) the compensation paid by the Plan the Plan's recordkeeper was not excessive, and (b) that each investment option that was offered in the Plan was prudent.

10.     Defendant's mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendant's actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

## JURISDICTION AND VENUE

11.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

12.     This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the

Plan is administered, where at least one of the alleged breaches took place, and where the Defendant resides.

## THE UNIVERSITY RETIREMENT PLAN

13.    The Plan is a qualified retirement plan commonly referred to as a 403(b) plan.

14.    The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

15.    More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

16.    Eligible faculty and staff members of the University are eligible participate in the Plan. The Plan provides the primary source of retirement income for many University employees. The ultimate retirement benefit provided to participants depends on the performance of investment options chosen for the Plan by Defendant.

17.    In theory, Defendant determines the appropriateness of the Plan's investment offerings, monitors investment performance, and reviews total plan and fund costs each year.

## THE PARTIES

### *Plaintiff's Standing*

18.    Plaintiff Karen A. Garceau (Garceau) is a current participant in the Plan under 29 U.S.C. §1002(7) because she has an individual account in the Plan. During the relevant time period, Garceau invested her retirement savings in the

Plan in several imprudent investments, including the following: MFS International New Discovery Fund R4, MIDJX; Victory RS Small Cap Growth Y, RSYEX; MFS Mid Cap Value Fund R4, MVCJX; and CREF Stock Share Class 2, QCSTPX.

19.     In terms of standing, §1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. Here the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches.

20.     The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254.

21.     Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendant's fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff. To be sure, Defendant has tacitly admitted the veracity and merit of the allegations made herein by making changes to many of the allegedly imprudent practices and decisions alleged herein after a previous participant made allegations of Defendant's breach of its fiduciary duty.

22.     To the extent a plaintiff must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiff here

has standing to bring this action on behalf of the Plan because she participated in the Plan and was injured by Defendant's unlawful conduct.

23.    To establish standing, a plaintiff need only show a constitutionally adequate injury flowing from those decisions or failures. The Plaintiff alleges such an injury for each claim.

24.    For example, Plaintiff has standing because Defendant's actions resulted in the Plan and Plaintiff paying excessive compensation to the recordkeeper. Garceau has standing because she invested in imprudent funds through the Plan. Thus, Garceau suffered a concrete injury traceable to Defendant's imprudent actions and fiduciary breaches.

25.    Garceau's individual account in the Plan was harmed because she invested in investment options that would have been removed from the Plan had Defendant discharged its fiduciary duties. These investment options underperformed numerous prudent alternatives that were available to the Plan, resulting in a loss of retirement savings. Moreover, Defendant replaced the challenged investment options after another participant complained of the same breaches of fiduciary duties – thereby admitting allegations of imprudence were well founded.

26.    As a result of Defendant's actions, the Plan is entitled to restitution in the amount of the difference between the value of Plan assets of a prudently administered Plan and the value of Plan assets as a result of Defendant's

imprudence. Under ERISA, the Plan would then allocate any recovery in a manner that is consistent with ERISA.

### *Defendant*

27.     Defendant is a private, for-profit, nonsectarian university with its principal place of business in Daytona Beach, Florida.

28.     Defendant offers a retirement plan to eligible employees: a 403(b) Plan which is a defined-contribution plan. In such plans, participating employees maintain individual investment accounts, which are funded by pretax contributions from the employees' salaries and, where applicable, matching contributions from the employer. Each participant chooses how to invest his or her funds, subject to an important limitation: Participants may choose only from the menu of options selected by Defendant.

29.     The performance of chosen investments, as well as the deduction of any associated costs, determines the amount of money a Plan participant will have saved for retirement.

30.     Defendant is the Plan Administrator under 29 U.S.C. §1002(16)(A)(i), and upon information and belief, with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it properly to carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of

the investment options made available to participants for the investment of their contributions and provision of their retirement income.

31.    Defendant is a fiduciary to the Plan because it exercised discretionary authority and discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of Plan assets and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

## CLASS ACTION ALLEGATIONS

32.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the following proposed class ("Class"):

> All persons, except Defendant's fiduciaries and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between April 2018 and the present (the "Class Period").

33.    The members of the Class are so numerous that joinder of all members is impractical. According to the 2022 Form 5500 that Defendant filed with the U.S. Department of Labor for the Plan, there were 5,116 Plan participants with account balances, as of December 31, 2022.

34.    Plaintiff's claims are typical of the claims of Plan participants. Plaintiff participated in the Plan and have suffered injuries because of Defendant's mismanagement of the Plan. Defendant treated Plaintiff consistently with other Plan participants and managed the Plan as a single entity. Plaintiff's claims and the claims of all Plan participants arise out of the same conduct, policies, and practices

of Defendant as alleged herein, and all Plan participants have been similarly affected by Defendant's wrongful conduct.

35.   There are questions of law and fact common to the Plan, and these questions predominate over questions affecting only individual Plan participants. Common legal and factual questions include, but are not limited to:

> A.   Whether Defendant is a fiduciary of the Plan;
>
> B.   Whether Defendant breached its fiduciary duty of prudence by engaging in the conduct described herein;
>
> C.   Whether Defendant failed to adequately monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;
>
> D.   The proper form of equitable and injunctive relief; and
>
> E.   The proper measure of relief.

37.   Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

38.   This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Plan would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because

prosecution of separate actions by the members of the Plan would create a risk of adjudications with respect to individual members of the Plan that, as a practical matter, would be dispositive of the interests of other Plan participants not parties to this action, or that would substantially impair or impede their ability to protect their interests.

39. In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendant has acted or refused to act on grounds generally applicable to the Plan, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Plan as a whole.

## DEFENDANT'S FIDUCIARY STATUS
## AND OVERVIEW OF FIDUCIARY DUTIES

40. ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

41. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other

property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

42.    As described above, Defendant was a fiduciary of the Plan because:

A.    it was so named; and/or

B.    it exercised authority or control respecting management or disposition of the Plan's assets; and/or

C.    it exercised discretionary authority or discretionary control respecting management of the Plan; and/or

D.    it had discretionary authority or discretionary responsibility in the administration of the Plan.

43.    As a fiduciary, Defendant is/was required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest  of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

44.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (internal citations omitted). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display...complete loyalty to the interests of the beneficiary

and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

45.    "Thus, in deciding whether and to what extent to invest in a particular investment, ***a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income***. A decision to make an investment may not be influenced by non-economic factors unless the investment, ***when judged solely on the basis of its economic value to the plan***, would be equal or superior to alternative investments available to the plan." *U.S. Dep't of Labor ERISA Adv. Op.* 88-16A, 1988 WL 222716, at \*3 (Dec. 19, 1988). (Emphasis added).

46.    In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

47.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist in a plan, which is "separate and apart from the [fiduciary's] duty to exercise prudence in

selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds…could theoretically, in combination, create a prudent portfolio." *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

48.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") provides:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

49.     During the Class Period, Defendant did not act prudently or in the best interests of the Plan's participants. Investment options chosen for a plan should not favor the fund provider over the plan's participants. Yet, here, to the detriment of the Plan and its participants, the Defendant included and retained in the Plan many investment options that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

50.     During the Class Period Defendant failed to have a proper system of review in place to ensure that participants in the Plan were being charged

appropriate and reasonable fees for each of the Plan's investment options. Defendant did not provide any education or training to individuals it appointed to serve as fiduciaries to the Plan. The individuals Defendant appointed to serve as fiduciaries were even unaware of what investments were offered by the Plan, the performance of such investments, how such investments were selected for inclusion in the Plan, the costs of such investments, or the performance of such investments.

51.     Additionally, Defendant failed to leverage the size of the Plan to negotiate lower and prudent expenses for certain investment options maintained in the Plan. Defendant selected investments for the Plan menu that were more expensive than identical investments offered by and available to the Plan from the same investment companies, resulting in pure waste. It was only after another participant complained that Defendant apparently began paying attention and replaced an array of imprudent investments from the Plan menu of investments.

52.     Defendant also caused the Plan to pay excessive compensation to the Plan's recordkeeper. Defendant failed to ever negotiate the recordkeeper's compensation. Defendant failed to ever seek bids from other recordkeepers. The individuals whom Defendant appointed to serve as Plan fiduciaries to control the recordkeeper's compensation who were deposed in the other participant's lawsuit did not even know the amount of the recordkeeper's compensation. It is not surprising then, that all of these monumental failures resulted in excessive compensation paid by the Plan to the recordkeeper.

53.    As set forth in detail below, Defendant breached fiduciary duties to the Plan and its participants and beneficiaries and is therefore liable for its breaches and the breaches of its co- fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## SPECIFIC ALLEGATIONS

### *Improper Management of the Plan Cost the Plan's Participants Millions in Savings*

54.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

55.    "The Restatement ... instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ...

Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[1]

56.    Higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

57.    Most participants in retirement plans, including both 401(k) and 403(b) plans, expect that accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[2] Although at all times 401(k) and 403(b) plans accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

58.    Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue

---

[1]    Available    at:    https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited June 14, 2022).

[2] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at:    https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited June 14, 2022).

to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

59.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[3] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.* at 5.

60.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from services like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons between funds. The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place funds in a given category based on their portfolio statistics and compositions over the past three years."[4]

61.     Thus, prudent and impartial plan fiduciaries should continuously monitor both the performance and cost of the investments selected for their 403(b) plans, as well as investigating alternatives in the marketplace to ensure that well-

---

[3] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited August 31, 2022).
[4] Available at http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited August 31, 2022).

performing, low-cost investment options are being made available to plan participants.

### *Defendant Breached Its Fiduciary Duties by Selecting More Expensive Share Classes Instead of Low-Cost Share Classes of the Same Funds*

62.     The Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act ("UPIA"), treatises, and seminal decisions confirming the duty.

63.     The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id.* § 2 comment.

64.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also*

Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

65.     As demonstrated by the chart below, in several instances during the Class Period, Defendant failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost.

66.     In fact, the chart below contains a non-exhaustive illustration of expensive share classes offered by the Plan during the Class Period and the available lower-cost share classes for the same fund:

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| MFS International New Discovery Fund R4 MIDJX | **1.04%** | MFS International New Discovery Fund R6 MIDLX | **.91%** |
| T. Rowe Price Blue Chip Growth Fund Retail TBCRX | **.68%** | T. Rowe Price Blue Chip Growth Fund I TBCIX | **.56%** |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| JPMorgan Mid Cap Growth Fund Select HLGEX | .93% | JPMorgan Mid Cap Growth R6 JMGMX | .70% |
| MFS Mid Cap Value Fund R4 MVCJX | .77% | MFS Mid Cap Value Fund R6 MVCKX | .64% |
| Victory RS Small Cap Growth Y RSYEX | 1.130% | Victory RS Small Cap Growth R6 RSEJX | 1.04% |
| CREF Bond Market Share Class R2 QCBMPX | .30% | CREF Bond Market Share Class R4 QCBMFX | .09% |
| CREF Equity Index Share Class R2 QCEQPX | .22% | CREF Equity Index Share Class R4 QCEQFX | .03% |
| CREFGlobal Equities Share Class R2 QCGLPX | .32% | CREFGlobal Equities Share Class R4 QCGLFX | .11% |
| CREF Inflation-Linked Bond Share Class R2 QCILPX | .25% | CREF Inflation-Linked Bond Share Class R4 QCILFX | .045% |
| CREF Money Market Share Class R2 QCMMPX | .24% | CREF Money Market Share Class R4 QCMMFX | .09% |
| CREF Stock Share Class R2 QCSTPX | .32% | CREF Stock Share Class R4 QCSTFX | .04% |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| CREF Social Choice Share Class R2 QCSCPX | **.25%** | CREF Social Choice Share Class R4 QSCCFX | **.040%** |

66.     As the table above illustrates, throughout the Class Period Defendant should have known of the existence and availability of lower-cost share classes, and it should have promptly transferred the Plan's investments in such funds to the least expensive share classes, however, Defendant failed to do so in a prudent manner.

67.     What is especially troubling here is TIAA is the recordkeeper for the Plan. Many of the funds with expensive share classes offered by the plan are funds issued by TIAA. Defendant allowed TIAA to freight the Plan with unreasonably expensive and poorly performing TIAA funds, when identical funds were offered by TIAA and available to the Plan at a much lower cost.

68.     Qualifying for lower share classes sometimes requires a minimum investment in individual funds. However, these minimums are waived for retirement plans like the Plan here. In any event, in most instances the Plan qualified for the lower cost share classes but is paying for higher cost share classes. Plan assets are being needlessly wasted and retirement savings frittered away. This is a classic breach of ERISA's fiduciary duty of prudence.

69.    A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the less expensive and more prudent share classes available and transferred the Plan's investments in the above-referenced funds into institutional shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, Defendant did not transfer Plan holdings in any of these funds from higher-priced share classes into the lowest-cost institutional share classes, in breach of their fiduciary duties, until after the other participant complained.

70.    There is no good-faith explanation for utilizing a high-cost share class when a lower-cost share class is available for the exact same investment. The Plan did not receive any additional services or benefits based on its selection of more expensive share classes; the only consequence was higher costs for the and its Plan participants.

### *Defendant Failed to Monitor or Control the*
### *Plan's Recordkeeping and Administrative Expenses*

71.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic

Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

72.    Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

73.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

74.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating lower recordkeeping expenses for the Plan. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis; however, the Plan here decided at some point (none of the deposed fiduciaries could testify when or why) that the Plan would compensate the record keeper based not on the number of Plan participates (which corresponds to the work the recordkeeper provides to the Plan), but rather to compensate the recordkeeper by awarding it a percentage of the assets invested in the Plan.

75.     Utilizing an asset-based approach is not *per se* imprudent. Plaintiff is not making a claim against Defendant for using an asset-based approach to pay compensate the recordkeeper.

76.     However, when asset-based compensation is left unchecked, it can be devastating for Plan participants. At worst, it is a way to hide fees. Nobody sees the money change hands, and very few understand how much the recordkeeper is being compensated. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is "free" when it is in fact expensive.

77.     Again, it is important to emphasize that asset-based compensation are tethered not to any actual services provided to the Plan; but rather, to a percentage of assets in the Plan. As the assets in the Plan increase, so too increases the recordkeeper's asset-based compensation. One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

78.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping compensation in order to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary

duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's compensation is reasonable.

79.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping compensation being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

80.     Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than reasonable compensation for the services provided to a plan, a prudent fiduciary must identify *all* compensation being paid to the plan's recordkeeper. To the extent that a Plan pays asset-based compensation to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total

26

compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

81.    Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

82.    Defendant has failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps. TIAA has been the Plan's recordkeepers during the entire Class Period.

83.    If Defendant had undertaken an RFP since 2016 in order to compare TIAA's costs with those of others in the marketplace, Defendant would have recognized that TIAA's compensation for recordkeeping services has been unreasonable.

84.    From 2016 to 2022 the Plan's assets and Participants were as follows:

| Year | Total Plan Assets (Form 5500 Sched H Line 1 l) | Participants with an Account Balance (Form 5500 Line 6g) | Recordkeeper Asset-Based Compensation | Per Participant Recordkeeper Compensation for Illustration Purposes |
|---|---|---|---|---|
| 2016 | $314,021,471 | 4,569 | $517,480 | $113 |
| 2017 | $367,016,973 | 4,398 | $442,675 | $100 |
| 2018 | $360,013,505 | 4,575 | $472,570 | $103 |
| 2019 | $431,617,628 | 4,784 | $435,397 | $91 |
| 2020 | $491,424,400 | 4,772 | $507,673 | $106 |
| 2021 | $559,574,599 | 5,163 | $411,587 | $79 |
| 2022 | $495,777,816 | 5,343 | $418,803 | $79 |

94.    From 2016 - 2018, Defendant paid the Plan recordkeeper 13 basis points on all Plan assets, plus additional compensation via several indirect sources. As the Plan's assets increased by nearly $50 million in this time period, so did the recordkeeper's compensation; but the Plan participants remained relatively level and the recordkeeper provided no additional services to merit increased compensation. The compensation the <u>Plan</u> paid to its recordkeeper from 2016 – 2018 was excessive.

95.    In 2019, the Plan's recordkeeper voluntarily agreed to reduce its compensation from the Plan from 13 basis points to 11 basis points of Plan assets,

plus additional compensation via several indirect sources. In 2019, the Plan's assets increased to over $430,000,000 while the number of Plan participants increased over 2018 only slightly. The increase in Plan assets, coupled with the increase in the other indirect compensation, offset the recordkeeper's voluntary, unnegotiated 2 basis point reduction. The recordkeeper's compensation remained excessive.

96.    In 2021, the Plan's recordkeeper again voluntarily agreed to reduce its compensation from 11 basis points to 7.8 basis points of Plan assets, plus additional compensation via several indirect sources. By 2021, the Plan's assets increased to nearly $560,000,000. The increase in Plan assets, coupled with the increase in the other indirect compensation, offset the recordkeeper's voluntary, unnegotiated 3.2 basis point reduction. The recordkeeper's compensation remained excessive.

97.    And this is just the asset-based compensation. The Plan caused the recordkeeper to also receive indirect compensation via float income, short term trading fees, excess fund fees, and revenue sharing (i.e., an additional asset-based fee on certain investments in the Plan).

98.    The table below illustrates the total compensation Defendant allowed the recordkeeper to receive from the Plan during the relevant time period.

|  | 2016 (3 months) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 (estimated) |
|---|---|---|---|---|---|---|---|---|
| Asset Based Fee | 129,370 | 442,675 | 472,570 | 435,397 | 507,673 | 451,930 | 411,587 | 418,803 |
| Excess Fund Fee | 17,347 | 66,129 | 39,315 | 51,797 | 61,551 | 77,333 | 78,128 | 187,458 |
| Float Income | 11,886 | 39,465 | 43,054 | 47,667 | 47,861 | 50,319 | 53,660 | 53,660 |
| Short Term Trading Fee | 101,407 | 336,033 | 372,754 | 365,691 | 374,712 | 443,028 | 502,254 | 429,542 |
| TOTAL | 260,009 | 884,303 | 927,693 | 900,552 | 991,797 | 1,022,609 | 1,045,629 | 1,089,462 |
| Target RK at $35: | 53,305 | 153,930 | 160,125 | 167,440 | 167,020 | 177,415 | 187,005 | 187,005 |
| Excess | 206,704 | 730,373 | 767,568 | 733,112 | 824,777 | 845,194 | 858,624 | 902,457 |
| PV Factor | 1.571 | 1.386 | 1.455 | 1.240 | 1.114 | 0.991 | 1.142 | 1.000 |

99.   When all sources of the recordkeeper's compensation are included, Defendant caused the Plan to pay its recordkeeper over $200 per year per participant. At an assumed $25 per participant recordkeeping charge, the total excess compensation is $6,228,879 with a present value of $7,430,376. At an assumed $35 per participant recordkeeping charge the excess fee is $5,868,809 with a present value of $7,001,795.

100.   Plaintiff does not allege that Defendant was required to compensate the Plan's recordkeeper using a per participant methodology. ERISA contains no such requirement.   Again, Plaintiff alleges the total compensation Defendant caused the Plan to pay its recordkeeper was excessive and unreasonable. Plaintiff provides numbers concerning the per participant compensation for illustration

purposes only and because that is how the market generally negotiates, measures, and compares recordkeeping compensation. It is a helpful measuring device. But Plaintiff's allegations are not tethered to the per participant compensation, but rather to all of the compensation Defendant caused the Plan to pay the Plan's recordkeeper.

101.   By comparison to other plans, the recordkeeping fees are excessive and unreasonably high. For instance, the 401k Averages Book (20th ed. 2020), examined recordkeeping fees for plans with less $200 million in assets (*i.e.*, substantially smaller than the Plan), and demonstrated that as plans increase in size the costs of recordkeeping generally decrease on a per participant basis—a classic example of economies of scale. But here the opposite is happening. As Plan assets increase so are the recordkeeper's compensation.

102.   A plan with 200 participants and $20 million in assets, the average recordkeeping and administration cost (through direct compensation) is $12 per participant. 401k Averages Book at 95. A plan with 2,000 participants and $200 million in assets, the average recordkeeping and administration cost (through direct compensation) is $5 per participant. *Id.* at 108. Defendant caused the Plan to pay $100 per participant. By any measure this is excessive and imprudent.

103.   Looking at recordkeeping costs for other plans of a similar size shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees. The chart below analyzes a few well-

managed plans having tens of thousands of participants with billions of dollars in assets under management:

| Name of Plan | Number of Participants | Value of Plan Assets | Total Reported Recordkeeping and Administrative Service Costs | Recordkeeping and Administrative Costs Per-Participant[5] | Record Keeper |
|---|---|---|---|---|---|
| The Dow Chemical Company Employees' Savings Plan | 37,868 | $10,913,979,302 | $932,742 | $25 | Fidelity |
| The Savings and Investment Plan [WPP Group] | 35,927 | $3,346,932,005 | $977,116 | $27 | Vanguard |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 46,943 | $3,793,834,091 | $1,526,401 | $33 | Fidelity |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $930,019 | $30 | Alight |

104.   Defendant's Plan is much smaller.  Thus, it should have been cheaper to manage.  With over just over 4,500 participants and less than $500 million in assets in 2020, Defendant should have been able to negotiate a total recordkeeping cost anywhere from $25 per participant to $30 from the beginning of the Class Period to the present. However, Defendant simply failed to do so. In fact, the Plan's

---

[5] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. See Instructions for Form 5500 (2019) at pg. 27 (defining each service code), available at https://www .dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/ reporting-and-filing/form-5500/2019-instructions.pdf.

recordkeeper voluntarily reduced its direct asset based compensation – with zero negotiation from Defendant – on several occasions throughout the relevant time period. The asset based fee could have been reduced to 5 basis points had Defendant even attempted to negotiate the fee. It is currently 7.8 basis points and unquestionably could have at least been that amount, had Defendant even approached satisfying its ERISA duty of prudence to control the recordkeepers compensation.

105.   As such, Defendant engaged no meaningful examination, comparison, negotiations, or benchmarking of the recordkeeper's compensation paid by the Plan. Had Defendant conducted any examination, comparison, negotiation, or benchmarking, Defendant would have known that the Plan was compensating TIAA at an inappropriate level. Plan participants bear this excessive fee burden and, accordingly, achieve considerably lower retirement savings, since the extra fees, particularly when compounded, have a damaging impact upon the returns attained by participant retirement savings.

106.   By failing to recognize that the Plan and its participants were being charged much higher fees than they should have been and/or failing to take effective remedial actions, Defendant breached its fiduciary duties to the Plan.

107.   The services that TIAA provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeepers and taken corrective action. Defendant's failure to monitor and

control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted a breach of the duty of prudence.

108.   Finally, as stated above, the Plan has nearly $500 million of assets. This is Plan participant money. Upon information and belief, Defendant agreed that anytime Plan participants deposit or withdraw money from their individual accounts, that the money will first pass through a TIAA clearing account.

109.   Upon information and belief, Defendant agreed TIAA could keep all of the interest earned on Plan participant accounts while participant money is in TIAA's clearing account. This is a form of indirect compensation that TIAA receives as the recordkeeper for the Plan. However, TIAA has not tracked, monitored, or negotiated the amount of compensation TIAA receives from income it earns on Participant money. Defendants breached its fiduciary duty of prudence by allowing TIAA to receive compensation from Plan participants without even knowing the amount of compensation TIAA collects from interest on participant money.

**FIRST CLAIM FOR RELIEF**
***Breaches of Fiduciary Duties of Prudence***

110.   Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

111.   As a fiduciary of the Plan, Defendant was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity

and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

112.   Defendant breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Defendant did not make prudent decisions regarding the Plan's investment lineup. Defendant selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. Defendant also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. In addition, Defendant failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

113.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

114.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendant is liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

## SECOND CLAIM FOR RELIEF
### *Failure to Adequately Monitor Other Fiduciaries and Service Providers*

115.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

116.    Defendant is the named fiduciary with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a).  Defendant is the Plan Administrator of the Plan under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

117.    Given that Defendant had the overall responsibility for the oversight of the Plan, Defendant had a fiduciary responsibility to monitor the performance of the other fiduciaries and service providers, including those delegated fiduciary responsibility to administer and manage Plan assets.

118.    A monitoring fiduciary must ensure that its monitored fiduciaries and service providers are performing their obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

119.    Defendant breached its fiduciary monitoring duties by, among other things:

a.      Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b.      Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperformance of Plan investments in violation of ERISA;

c.      Failing to ensure that the monitored fiduciaries and service providers had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeepers and the amount of any revenue sharing payments; a process to prevent the recordkeepers from receiving revenue sharing that would increase the recordkeepers' compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d.      Failing to ensure that the monitored fiduciaries and service providers considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's mutual fund and insurance company variable annuity options; and

e.      Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

115.    Had Defendant discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged

herein, the Plan, the Plaintiff, and the other Class Members lost millions of dollars of retirement savings.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

1. Find and declare that the Defendant has breached its fiduciary duties as described above;

2. Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3. Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4. Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5. Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6. Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7. Reform the Plan to include only prudent investments;

8. Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

9. Certify the Class, appoint the Plaintiff as class representatives, and appoint their counsel as Class Counsel;

10. Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

11. Order the payment of interest to the extent it is allowed by law;

and

12. Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 23rd day of April, 2024.

Respectfully submitted,

**BRANDON J. HILL**
Florida Bar Number: 37061
**LUIS A. CABASSA, P.A.**
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK**
Florida Bar Number: **0285020**
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Direct: 813-337-7992
Main: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: gdesane@wfclaw.com
*Attorneys for Plaintiff*