## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**KAREN A. GARCEAU on behalf of the Embry-Riddle Aeronautical University DC Retirement Plan, individually and as a representative of a class of participants and beneficiaries,**

        **Plaintiff,**

**v.**

**EMBRY-RIDDLE AERONAUTICAL UNIVERSITY, INC,**

        **Defendant.**
_____/

**Case No. 6:24-cv-755-PGB-LHP**

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Karen A. Garceau (hereinafter, "Plaintiff") respectfully moves for certification pursuant to Fed. R. Civ. P. 23 of the following class:

> All persons, except Defendant's fiduciaries and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between April 23, 2018 and the present (the "Class Period").

This case is similar to ERISA breach of fiduciary duty actions against universities certified by courts throughout the country, including in *Henderson v. Emory Univ.*, No. 1:16-CV-2920-CAP, 2018 WL 6332343 (N.D. Ga. Sept. 13, 2018) more recently in *Santiago v. Univ. of Miami*, No. 1:20-CV-21784, (S.D. Fla. April 7, 2022)(for settlement purposes). When granting a similar motion for class certification in another university 403(b) retirement plan case, the court in *Cunningham v. Cornell Univ.*, No. 16-CV-6525 (PKC), 2019 WL 275827, at *2 (S.D.N.Y. Jan. 22, 2019) highlighted that federal courts routinely grant such motions for class certification in these types of ERISA cases and went on to support the statement with a string cite of recent cases granting class certification in cases just like this one.[1] The same outcome should follow here. Class certification should be granted.

---

[1] *See e.g.*, *Cates v. Trs. of Columbia Univ. in the City of New York*, 16 cv 6524 (GBD)(SDA), (S.D.N.Y. Nov. 15, 2018); *Henderson v. Emory Univ.*, No. 1:16-CV-2920-CAP, 2018 WL 6332343 (N.D. Ga. Sept. 13, 2018); *Clark v. Duke Univ.*, 16 cv 1044, 2018 WL 1801946 (M.D.N.C. Apr. 13, 2018); *Sacerdote v. New York Univ.*, 16 cv 6284 (KBF), 2018 WL 840364, at *8 (S.D.N.Y. Feb. 13, 2018)); *Munro v. Univ. of S. California*, No. 2:16-CV-06191-VAP-EX, 2019 WL 7842551, at *4 (C.D. Cal. Dec. 20, 2019) (granting motion for class certification in university retirement plan case), and *Tracey v. MIT*, No. 16-CV-11620-NMG, 2018 WL 5114167, at *6 (D. Mass. Oct. 19, 2018) (same).

This Motion is based on the accompanying Memorandum of Points and Authorities, Expert Reports by Al Otto ("Exhibit A, Otto Report") and Ty Minnich ("Exhibit B, Minnich Report"), Declaration of Karen Garceau ("Exhibit C, Garceau Decl."), Declarations of Brandon J. Hill ("Exhibit D, Hill Decl."), Luis A. Cabassa ("Exhibit E, Cabassa Decl."), Amanda E. Heystek ("Exhibit F, Heystek Decl."), and accompanying exhibits.[2]

Finally, Plaintiff readily acknowledges this Honorable Court denied the motion for class certification filed in a companion case to this matter, *Lopez v. Embry-Riddle Aeronautical Univ.,* Case No.: 6:22-cv-01580-PGB-LHP (M.D. Fla, Feb. 26, 2024) (order denying motion for class certification). Plaintiff has carefully addressed and attempted to cure the Article III standing-related deficiencies the Court found in the *Lopez* class certification motion to ensure class certification is appropriate here. Ms. Garceau unquestionably has standing because she invested in challenged funds at issue in the Complaint.[3]

---

[2] Also attached is attached is the sworn deposition transcript of Defendant's main corporate representative's testimony, Brandon Young ("Exhibit G, Young"), the sworn deposition transcript of Defendant's secondary corporate representative testimony, Dr. Randy Howard ("Exhibit H, Howard"), and Defendant's annual Form 5500's from 2018 - 2023 (attached as Exhibits J through O).).

[3] *See* Otto Report, ¶ 9 ("At the time the Complaint was filed, according to her quarterly statement which I reviewed and relied upon when forming my opinions set forth in this report, she was invested in several of the investments identified in the Complaint including: MFS International New Discovery Fund R4, MIDJX; MFS Mid Cap Value Fund R4, MVCJX; and CREF Stock Share Class 2, QCSTPX.")

# I.    MEMORANDUM OF POINTS AND AUTHORITIES

## A.    INTRODUCTION

As a fiduciary to the Plan, Embry-Riddle Aeronautical University, Inc. ("Defendant") is  subject to strict fiduciary standards of conduct derived from the common law of trusts—duties that the Eleventh Circuit has call "the highest known to law.'" *Fuller v. Suntrust Banks, Inc*., 744 F.3d 685, 695 (11th Cir. 2014); *see also* 29 U.S.C. §1104(a). To obtain relief from fiduciary misconduct, Congress authorized retirement plan participants (like Plaintiff here) to bring suit "in a representative capacity on behalf of the plan as a whole." *Mass Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985); *see* 29 U.S.C. § 1109(a), § 1132(a)(2).

Because of the representative nature of ERISA fiduciary breach actions, involving plan-wide conduct and remedies, courts routinely hold that they present "paradigmatic" examples of claims that should be certified as a Rule 23(b)(1) class. *In re Schering Plough Corp. ERISA Litig*., 589 F.3d 585, 604 (3d Cir. 2009). Courts in this Circuit have reached the same conclusion, because "[i]n light of the derivative nature of ERISA [Section] 502(a)(2) claims, breach of fiduciary duty claims brought under [Section] 502(a)(2) are paradigmatic examples of claims appropriate for certification as a Rule 23(b)(1) class, as numerous courts have held." *In re Suntrust Banks, Inc. ERISA Litig*., No. 1:08-CV-03384-RWS, 2016 WL 4377131, at *8 (N.D. Ga. Aug. 17, 2016).

This Motion should be granted and the class certified for all of the same reasons Judge Byron certified a national class of participants and beneficiaries in

the Plan L3 Harris Retirement Savings Plan (the "L3 Plan").[4] In the *L3 Harris* Order, Judge Byron held, in part, that "the proposed class representatives and members of the proposed class therefore allegedly suffered similar harm resulting from Defendants' alleged fiduciary breaches." (*L3 Harris* Order, p. 4). The claims, and even defenses in this case are nearly identical to those in the *L3 Harris* case. Certification is warranted here, just as it was in *L3 Harris*.

Besides Judge Byron's well-reasoned class certification Order from the *L3 Harris* case, Judge Covington's recent class certification decision from *Huang v. TriNet HR III, Inc.*, No. 8:20-CV-2293-VMC-TGW, 2022 WL 13631836, at *1 (M.D. Fla. Oct. 21, 2022) is also especially instructive. Just like in the *L3 Harris* case, the plaintiff's claims in *Huang* were similar ERISA breach of fiduciary duty claims to the ERISA breach of fiduciary duty claims here. Judge Covington certified *Huang* as a class action on October 21, 2022. Judge Covington's class certification order from *Huang* should provide the Court guidance as to how this action ought to proceed on a procedural basis. *Huang v. TriNet HR III, Inc.*, No. 8:20-CV-2293-VMC-TGW, 2022 WL 13631836 (M.D. Fla. Oct. 21, 2022)

This Honorable Court should follow the analysis and holdings of legions of other decisions from federal courts throughout the country,[5] including both Judge

---

[4] A courtesy copy of Judge Byron's L3 Harris Order is attached as Exhibit I.

[5] To be sure, legions of federal courts have certified similar ERISA cases challenging the fees and/or investments in defined contribution plans. *See Garcia v. Alticor, Inc.*, No. 1:20-cv-01078, Doc. 59 (W.D. Mich. Mar. 6, 2023)*; Johnson v. The PNC Financial Servs. Grp., Inc.*, No. 2:20-cv-1493-CCW, Doc. No. 80 (W.D. Pa. Sept. 16, 2022); *Cunningham v. Wawa, Inc.*, 387 F. Supp. 3d 529 (E.D. Pa. 2019); *In re Biogen ERISA Litig.*, No. 20-cv-11325, Doc 104 (D. Mass. Nov. 8, 2022); *Moitoso v. FMR LLC*, No. 1:18-cv-12122, Doc. 83 (D. Mass. May 7, 2019); *Velazquez v. Mass. Fin. Srvs. LLC*, No. 1:17-cv-11249, Doc. 94 (D. Mass. June 25, 2019); *Wehner v. Genentech, Inc.*, No.

Byron and Judge Covington, and certify this case as a class action.

## II.    BACKGROUND FACTS

**Overview of the Plan:** The Plan is a defined contribution and profit-sharing 403(b) plan that provides the primary source of retirement income for Defendant's current and former employees. (Complaint, ¶¶ 13-16.)(Ex. A, Otto Report, p. ¶ 14.) As the Plan administrator, Defendant is a statutory fiduciary to the Plan. (Complaint, ¶¶ 30-31.) As of December 31, 2023, the Plan had $575,180,245 in assets. (Ex. A, Otto Report, ¶ 17); (Exhibit O, 2023 Form 5500 for the Plan, p. 42.)

**Defendant Selected Imprudent Investments for the Plan:** Defendant has fiduciary duties to prudently select and monitor the Plan's investments and, also, to defray reasonable expenses of administering the Plan. (*See* 29 U.S.C. § 1104(a).) Plans with more than five hundred million dollars of assets under management (like the Plan here) qualify for the lowest-cost share classes available on the market. Defendant failed to prudently monitor the Plan and to determine whether the Plan was invested in the prudent share classes available to the Plan. (Ex. A, Otto Report, ¶¶ 139-143). Defendant repeatedly included in the Plan's investment menu high-cost share classes when identical low-cost share classes were available.[6] Unlike a claim premised on an imprudent choice

---

3:20-cv-06894-RS, Doc. 98 (N.D. Cal. Sept. 22, 2022); *In re Medstar ERISA Litig*., No. 1:20-cv-01984-DLB, Doc. 64 (D. Md. July 12, 2022).

[6] *See* Complaint ¶ 66, listing higher share classes Plan is invested in versus identical lower share class available to Defendant.

between two different investments that perform differently over time, a claim premised on the selection of a more expensive share class of the same investment **guarantees** worse returns. *Forman v. TriHealth, Inc.*, 40 F.4th 443, 451 (6th Cir. 2022). The two share classes will produce the same initial returns, but higher costs erode the more expensive share classes' gains and increase losses. As costs compound, the differential grows each year. Over time, the unnecessary and excessive fees become the most salient features of investment performance. Defendant failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share classes available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost. (Complaint ¶ 65-70.)

A prudent fiduciary conducting an impartial review of the Plan's investments on a monthly, quarterly, or at least an annual basis, would have easily identified the prudent lower cost share classes available to the Plan and transferred the Plan's investments into lower cost share classes at the earliest opportunity. (*Id.*) Yet, despite the availability of lower cost share classes, Defendant failed to do so. (*Id.*) This is a classic breach of ERISA's fiduciary duty of prudence. *See Hughes v. Northwestern University,* 142 S. Ct. 737, 740 (2022) (ERISA "requires" fiduciaries to monitor all plan investments and remove any imprudent ones.)

**TIAA Received Excessive Compensation:** The Teachers Insurance and Annuity Association of America ("TIAA") is the Plan's recordkeeper. (Complaint ¶ 82.) With over 5,000 participants and more than $500 million in assets in 2023

in the Plan, the Defendant should have been able to negotiate a recordkeeping cost with TIAA anywhere from $25 per participant to $30 from the beginning of the Class Period to the present. (Complaint, ¶ 104). However, Defendant simply failed to do so. (*Id.*) It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees are reasonable. *See, e.g., Tussey v. ABB, Inc*., 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." (Complaint, ¶ 78.)

In this case, Defendant failed to prudently manage and control the compensation TIAA received from the Plan. (Complaint, ¶ 82.) Defendant has failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps. TIAA has been the Plan's recordkeepers during the entire Class Period. (Complaint, ¶ 82); (Ex. A, Otto Report, ¶¶ 108-110); (Ex. B, Minnich Report, p. 4.)

From 2016 - 2018, Defendant paid the Plan recordkeeper 13 basis points on all Plan assets, plus additional compensation via several indirect sources. (Complaint, ¶ 94.); (Ex. B, Minnich Report, p. 12.) As the Plan's assets increased by nearly $50 million in this time period, so did the recordkeeper's compensation; but the Plan participants remained relatively level and the recordkeeper provided

no additional services to merit increased compensation. (Complaint, ¶ 94); (Ex. B, Minnich Report, p. 11.) In 2019, the Plan's recordkeeper voluntarily agreed to reduce its compensation from the Plan from 13 basis points to 11 basis points of Plan assets, plus additional compensation via several indirect sources. (Complaint, ¶ 95); (Ex. B, Minnich Report, p. 12 citing to Recordkeeping Services Agreement between TIAA and ERAU, September 16, 2006, and Amendments Nos. 9–11, 14.)

In 2019, the Plan's assets increased to over $430,000,000 while the number of Plan participants increased over 2018 only slightly. (Complaint, ¶ 95.) The increase in Plan assets, coupled with the increase in the other indirect compensation, offset the recordkeeper's voluntary, unnegotiated 2 basis point reduction. (*Id.*) The recordkeeper's compensation remained excessive.  (*Id.*)

In 2021, the Plan's recordkeeper again voluntarily agreed to reduce its compensation from 11 basis points to 7.8 basis points of Plan assets, plus additional compensation via several indirect sources. (*Id.* ¶ 96.)  By 2021, the Plan's assets increased to nearly $560,000,000. (*Id.*) The increase in Plan assets, coupled with the increase in the other indirect compensation, offset the recordkeeper's voluntary, unnegotiated 3.2 basis point reduction. The recordkeeper's compensation remained excessive. (*Id.*)  And this is just the asset-based compensation. (*Id.* ¶ 97.)

In 2022, there were 5,343 participants with active account balances. (Ex. A, Otto Report, ¶ 76.) The Plan's annual 5500 disclosure for 2022 shows Defendant caused the Plan to pay the recordkeeper $403,254 in direct compensation. (*Id.*) By dividing the total amount of direct compensation by the number of plan

participants the number is $75.47. (*Id.*) Again, according to the Plan's annual 5500 disclosure, which was submitted to the Department of Labor under penalty of perjury, Defendant caused the Plan to pay the recordkeeper indirect compensation in addition to direct compensation. (*Id.*) Indirect compensation was paid by the Plan to the recordkeeper from short term trading fees, from revenue sharing, and from an array of other sources as acknowledged on the Plan's 5500 disclosures. (*Id.*) When the indirect compensation sources are factored into the recordkeeper's compensation, the total amount of compensation Defendant caused the Plan to pay the recordkeeper is approximately $165 per participant. (*Id.*)

The 2021 and 2022 5500 disclosures filed by Defendant are consistent with all of the disclosures during the relevant time period. (*Id.*, ¶ 77.) All of the disclosures show Defendant caused the Plan to pay the recordkeeper direct and indirect compensation. (*Id.*) All of the 5500s caused the Plan to pay excessive compensation to the recordkeeper. (*Id.*) Thus, Defendant caused Ms. Garceau to pay excessive compensation to the recordkeeper. (*Id.*)

Not only that, incredibly—and despite having an obligation to do so—Defendant never bothered during the entire class period to solicit Requests for Proposal from other recordkeepers. (Complaint, ¶ 83). As explained by Plaintiff's expert, Ty Minnich, in his attached report, Defendant did not negotiate reasonable compensation to the recordkeeper for the Plan, it did not properly monitor the recordkeeper's compensation and did not put the Plan out for a competitive bid for recordkeeping services using a request for proposal (RFP) process since before

2018. (Ex. B, Minnich Report, p. 4.) Further, Defendant did not conduct an RFP despite evidence from the Fiduciary Benchmarking Reports that the Plan's compensation to the recordkeeper was excessive. (*Id.*) Deposition testimony in this case shows participants on the Plan's Retirement Committee did not and do not even know the amount the Plan pays its recordkeeper for services. (*Id.*) If the Defendant had acted consistent with well-recognized industry practices of fiduciaries in its position, Defendant would have competitively bid the Plan's recordkeeping services through an RFP process on or before 2018. In addition, Defendant would have continued to monitor and negotiate fees by completing an RFP every 3 to 5 years. (*Id.*) *As* a result, Defendant caused the Plan to incur excessive and unreasonable recordkeeping expenses. (*Id.*)

Defendant admitted during its corporate representative deposition that no RFP has occurred since 2013. (Ex. G, Young, p. 50, line 14 - p. 51, line 6.) To be sure, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. (Ex. B., Minnich Report, pp. 4-6.) At an absolute minimum, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. (*Id.*, p. 5.) But once again, the undisputed evidence plainly shows Defendant failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake an RFP for the entire

class period. (*Id.*, p. 4.)

Not only did Defendant cause the Plan to pay TIAA excessive direct compensation, Defendant also caused the Plan to pay TIAA millions in excessive indirect compensation. One such method TIAA earns indirect compensation from the Plan is revenue sharing. (Ex. A, Otto Report, ¶ 75, 76, 82, 122.) Revenue sharing occurs when a recordkeeper collects additional compensation by taking a portion of money (typically on a quarterly basis) from Plan participants' individual accounts. (*Id.* ¶ 60.) Revenue sharing is particularly problematic here because the compensation recordkeepers receive via revenue sharing is asset-based. (*Id.*, ¶¶ 66-76.) The amount of compensation usually bears no relation to a reasonable recordkeeping fee. (*Id.*, ¶¶ 66-67.) The more money that is invested in a plan, the more compensation a recordkeeper receives when fiduciaries fail to prudently monitor and control the recordkeeper's revenue sharing compensation. (*Id.*)

During the relevant time period, Defendant filed with the U.S. Department of Labor annual disclosures that reveal TIAA received (and continues to receive) millions of dollars from the Plan and Plan participants in indirect revenue sharing payments during the class period. (Ex. A, Otto Report, ¶¶, 75, 76, 136.) As the Plan's assets increase, so did (and does) TIAA's compensation. TIAA's compensation is already excessive but continues to skyrocket as Plan's assets increase. Specifically, Plan assets have increased from $360,013,505 in 2018 to $575,180,245 in 2023 – for a total increase of more than $200 million. (Exhibit J, p. 43, and Exhibit O, p. 42.) The number of Plan participants has not increased proportionally, ranging

anywhere from 4,417 up to 6,321 participants. But because TIAA's compensation is tied to the assets in the Plan it continues to pocket more and more money from Plan participants through revenue sharing simply because Plan assets increase without having to do any more work to actually earn the additional compensation. Put simply, the revenue sharing arrangement Defendant entered into with TIAA gives TIAA a never-ending windfall of cash that only grows as the Plan's assets grow. This arrangement is a great deal for TIAA. But it is a terrible deal for the Plan whose participants retirement accounts suffer as a result.

Defendant also agreed that anytime Plan participants deposit or withdraw money from their individual accounts that Plan participant money will first pass through a TIAA clearing account. (Complaint ¶ 108); (*see also* Ex. A, Otto Report, ¶¶ 38, 41, 121, and Ex. B, Minnich Report, p. 14, discussing float.) This is commonly referred to as the "float." (*Id.*) Defendant further agreed that as part of TIAA's compensation for services to the Plan, TIAA may keep for itself all of the interest earned on Plan participant money while participant money is in TIAA's clearing account – often for several days or weeks. (*Id.*)

When Defendant's corporate representative was asked if the Defendant negotiated the amount of compensation that TIAA was entitled to keep via interest earned in its clearing account on the "float", he simply said: "[n]ot specifically in float compensation." (Ex. H, Howard, p. 33, lines 9-14.)

**Deposition Testimony and Documentary Evidence Confirms Defendant's Fiduciary Breaches:** Defendant's main corporate representative,

Brandon Young, who currently works for Defendant as Vice President and Chief of Human Resources was deposed on February 25, 2025. (Exhibit G). Dr. Randy Howard also served as Defendant's corporate representative. He was deposed on the same day. (Exhibit H).

Mr. Young testified that the Defendant has a retirement plan committee, which was set up to meet quarterly with TIAA (Defendant's recordkeeper) and CAPTRUST (Defendant's financial advisor). (Ex. G, Young, p. 57, lines 3 – p. 13, p. 66, line 15 - p. 67, lines 1-5.) The committee members are all employees of Defendant. (Ex. G, Young, p. 18, line 4 - p. 19, line 4.) They are ERISA fiduciaries to the Plan and are supposed to be prudently administering the Plan on a day-to-day basis. Mr. Young's testimony made clear that the committee abrogated all meaningful fiduciary responsibilities for the Plan to TIAA and other third parties (CAPTRUST) who are **not** fiduciaries to the Plan. (Ex. G, Young, p. 12, lines 2-11; p. 33, line 6 - p. 34, line 17.) In fact, for example, Mr. Young testified CAPTRUST is a fiduciary to the plan. (Ex. G, Young, p. 11, lines 12-13.) It is not. Rather, it is only an adviser.

This testimony from Mr. Young unequivocally shows Defendant abrogated its fiduciary duties to third parties who are for-profit companies (TIAA and CAPTRUST), owe no fiduciary duties to the Plan, and whose business model is predicated on profiting from the Plan and Plan participants. In effect, Defendant has allowed two separate for-profit proverbial wolves (TIAA and CAPTRUST) to guard the hen house (the Plan). It should come as no surprise to anyone then that

the Plan is paying excessive compensation to the same service providers who Defendant is allowing to set and receive compensation from the Plan.

In addition, Mr. Young testified he received fiduciary training as a committee member he generally received training only "…twice, if not three times." (Ex. G, Young, p. 12, line 12 - p. 15, line 11.) Mr. Young was unable to recall whether he received any training at the time he was appointed to serve on the Plan's retirement committee. (Ex. G, Young, p. 19, lines 15-24.) It was imprudent for Defendant to appoint committee members, like Mr. Young, as fiduciaries for a $500 million Plan without proper experience, training, or education before their appointment to the committee. It was also imprudent for Defendant to fail to provide proper training and education to Committee members after their appointment. Simply relying on handouts and conferences put on by the very companies (TIAA and CAPTRUST) responsible for fleecing the Plan of millions of dollars is not a prudent way to educate fiduciaries on how to prudently protect and grow the hundreds of millions of dollars they have been entrusted with. The lack of experience, education, and training doomed the committee members, like Mr. Young, to failure. As a result, hard earned retirement savings lined the pockets of TIAA and CAPTRUST, not the employees and Plan participants.

In reality, the Plan has no true functional fiduciaries. Mr. Young even testified that, in his role as the retirement committee chair, he does not report to anyone. (Ex. G, Young, p. 20, lines 2 – 18.) ("No. No, I'm saying as my role -- my role as CHRO, I report to the COO, but I don't report, as chairman of the

committee, to the COO, if that makes sense.") After Mr. Young admitted that he does not report to anyone at the university about the Plan, he was then asked whether, "[d]oes the committee issue written reports to anyone at the university with respect to what's going on at the committee level?" Mr. Young responded as follows: "The committee -- the minutes and the agendas and those things that are discussed at the committee do[] not get reported out to another member of senior leadership that I'm aware of." (Ex. G, Young, p. 21, lines 3-9.) Mr. Young's testimony confirms Defendant have breached ERISA's duty to prudently monitor committee members, which is Count II of Plaintiff's Complaint.

### III.    ERISA PROVIDES FOR PLAN WIDE REMEDIES

In ERISA, Congress established a cause of action exclusively for plan relief, not individual relief. *LaRue v. DeWolff, Boberg & Assocs*., 552 U.S. 248, 256 (2008); *see* 29 U.S.C. §§ 1109(a), 1132(a)(2) [ERISA §§ 409(a), 502(a)(2)]. Congress authorized certain classes of plaintiffs—the Secretary of Labor, a plan participant, or a plan fiduciary—to bring a civil action "for appropriate relief under section 1109," which is exclusively plan relief. 29 U.S.C. § 1132(a)(2).

### IV.    STANDING

"A plaintiff's standing to bring and maintain her lawsuit is a fundamental component of a federal court's subject matter jurisdiction." *Huang v. TriNet HR III, Inc*., No. 8:20-CV-2293-VMC-TGW, 2022 WL 13631836, at *3 (M.D. Fla. Oct. 21, 2022)(quoting *Baez v. LTD Fin. Servs., L.P*., No. 6:15-cv-1043-PGB-DCI, 2016 WL 3189133, at *2 (M.D. Fla. June 8, 2016)). To establish standing, "[t]he plaintiff

15

must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016). The injury in fact requirement is the most important element. *Spokeo*, 136 S. Ct. at 1547. An injury in fact is " 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id*. at 1548 (quoting Lujan, 504 U.S. at 560). The injury must be "particularized," meaning it "must affect the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560 n.1). Additionally, the injury must be "concrete," meaning "it must actually exist." *Spokeo*, 136 S. Ct. at 1548.

Tracking Judge Covington's decision in *Huang*, Plaintiff has standing to pursue her claims. She invested in challenged funds in the Plan and paid excessive recordkeeping fees. *See Huang,* at *5. As to the challenged funds, at the time the Complaint was filed, according to her quarterly statement which Plaintiff's expert reviewed and relied upon when forming his opinions his report, Plaintiff was invested in several of the investments identified in the Complaint, including: MFS International New Discovery Fund R4, MIDJX; MFS Mid Cap Value Fund R4, MVCJX; and CREF Stock Share Class 2, QCSTPX. (Ex. A, Otto Report, ¶ 19.) Each of these funds is challenged in the Complaint. (Complaint, ¶ 66.)

As to excessive recordkeeping fees paid by Plaintiff, Defendant caused Ms. Garceau to pay excessive compensation to the recordkeeper. (Ex. A, Otto Report,

¶ 78.) Defendant caused Ms. Garceau to pay $16.81 in direct recordkeeping compensation to the Plan's recordkeeper in 2023.  (*Id.*, ¶ 79.) The amounts of direct compensation listed in the quarterly account statements paid by Ms. Garceau to the recordkeeper do not include any indirect compensation paid by Ms. Garceau to the recordkeeper. (*Id.*, ¶ 80.) The amount of indirect compensation Ms. Garceau paid to the recordkeeper is not disclosed in her quarterly account statements. (*Id.*, ¶ 81.) In 2023, Ms. Garceau had nearly $20,000 invested in the Plan in funds that paid revenue sharing. (*Id.*, ¶ 82.)  Those funds on average paid 20 basis points of revenue sharing to the recordkeeper. 20 Basis points of $20,000 is roughly $40. (*Id.*) Accordingly, once the $40 is added to the direct compensation for 2023, Ms. Garceau paid $56 to the recordkeeper in 2023. (*Id.*, ¶ 83.) These amounts do not include other sources of indirect compensation Ms. Garceau paid to the recordkeeper. (*Id.*) All of the other sources of indirect compensation identified in this report only add to the magnitude of losses suffered by Ms. Garceau and all plan participants. (*Id.*) $56 is an excessive amount of compensation to pay to the Plan's recordkeeper. (*Id.*, ¶ 84.)

Thus, Plaintiff has demonstrated an injury in fact by investing in the challenged funds and paying allegedly excessive recordkeeping fees. *Huang*, at *4. Plaintiff, along with all other Plan participants, was injured in the same manner due to Defendant's failure to discharge its duties in the interests of Plan participants, leading to unreasonable recordkeeping fees and unreasonable investment options with high expenses and poor performance. *Huang*, at *5; *see*

*also Fallick v. Nationwide Mut. Ins. Co.,* 162 F.3d 410, 424 (6th Cir. 1998*)* (reversing denial of class certification and determining named plaintiff had demonstrated constitutional standing to bring claims related to plans to which he did not belong); *Forbush v. J.C. Penney Co*., 994 F.2d 1101, 1106 (5th Cir. 1993) (reversing denial of class certification where the named plaintiff was only invested in one of four challenged pension plans).  As set forth above, in accordance with *Huang*, Plaintiff unquestionably  suffered an injury (economic injury). The injury is fairly traceable to Defendant's conduct, namely its multiple breaches of ERISA's duty of prudence and duty to monitor.  Also, the injury is likely to be redressed by a favorable judicial decision via Plan-wide relief made available by ERISA. Thus, Plaintiff has standing.

Finally, Defendant will likely argue that its experts, Mr. Grenadier and Mr. Gissiner, disagree with Plaintiff's experts on many aspects of this case, including on the economic injuries suffered by Plaintiff. But, at best, Mr. Grenadier's and Mr. Gissiner's reports merely give rise to a "battle of the experts" the Court should decline to resolve at the class certification stage just as other district courts in this Circuit have declined to do. For example, in *Navelski v. Int'l Paper Co*., 261 F.Supp.3d 1212 (N.D. Fla. 2017), the court declined to resolve the "battle of the experts" at the class certification stage, finding that the predominance requirement for class certification was satisfied, despite the experts' disagreement regarding causation. In doing so, the court stated that "While a district court's class certification analysis "may entail some overlap with the merits of the plaintiff's

underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466, 133 S.Ct. 1184 (2013). Rather, "[m]erits questions may be considered to the extent - but only to the extent - that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. The same outcome should follow here. The Court should decline any invitation by Defendant to engage in a "battle of the experts" at the class certification stage. *See also In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 423 (M.D. Fla. 2018) (granting motion for class certification and declining to engage in "battle of the experts" at class certification stage).

## V.    CLASS CERTIFICATION[7]

To obtain class certification, Plaintiff must show that the class meets the four prerequisites of Federal Rule of Civil Procedure 23(a)—referred to as numerosity, commonality, typicality, and adequacy of representation—and that the class is properly certified under one of the categories set forth in Rule 23(b). Fed. R. Civ. P. 23(a)–(b).

### A.    Rule 23(a) is Satisfied

#### 1.    Numerosity

---

[7] Like in *Huang*, here the proposed class definition is objective and the identification of its members is administratively feasible via the Plans' participant records. The Plan participants during the relevant time can be readily determined from the records of the Plan. Thus, ascertainability is unquestionably satisfied. *Huang v. TriNet HR III, Inc.*, No. 8:20-CV-2293-VMC-TGW, 2022 WL 13631836, at *5 (M.D. Fla. Oct. 21, 2022).

Numerosity asks whether "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the Plan had between in excess of 4,600 participants for each year throughout the proposed class period. Joinder is unquestionably impracticable. Numerosity is met.

### 2.   Commonality

"[T]here are questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). Commonality is satisfied when there is at least one common question, the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*., at 350, 359 ("[E]ven a single common question will do." (quotation and editing marks omitted). Because an ERISA fiduciary breach claim is an action on behalf of a plan regarding duties owed at the plan level, "commonality is quite likely to be satisfied." *Schering*, 589 F.3d at 599 n.11. Defendant owed fiduciary duties to the Plan as a whole. *See* 29 U.S.C. § 1104(a)(1) ("a fiduciary shall discharge his duties with respect to a plan"). Defendant's decisions regarding TIAA's compensation and the Plan's investments were Plan-level decisions that applied to the Plan and all participants across the board. Defendant's compensated TIAA through a Plan-level contract for services to the entire Plan. Defendant provided the same Plan-level investment lineup to all Plan participants. Defendant used the same allegedly defective fiduciary process to monitor (or not) the TIAA's compensation and the Plan's investment options.

In light of this common backdrop and Defendant's common course of conduct, each element of Plaintiff's claims requires answering a common

contention upon which all class members' recovery depends. To prevail, Plaintiff "must prove a breach of a fiduciary duty and a prima facie case of loss to the plan," which shifts the burden "to the fiduciary to prove that the loss was not caused by … the breach of duty." *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995) (citation omitted). Determining whether those elements are met will require the factfinder to resolve multiple common contentions that will resolve the validity of all class members' claims. As to each count set forth in the Complaint, the factfinder must first determine whether Defendant was a fiduciary to the Plan. *See Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). If so, the factfinder will then have to determine whether Defendant breached their fiduciary duties in each respect alleged by Plaintiff. Upon finding that Defendant violated ERISA, the factfinder must then determine whether Plaintiff has made a prima facie showing of loss and the proper benchmarks to measure losses—*i.e.*, whether TIAA's compensation was unreasonable and whether imprudent Plan investments underperformed prudent alternatives.[8] The evidence needed to answer these contentions are Plan-level facts and thus are the same for all the Plan participants. These answers do not depend on particular circumstances of any one participant. Therefore, the questions of law and fact in this action are common to each class

---

[8] *See Henderson v. Emory Univ.*, No. 1:16-CV-2920-CAP, 2018 WL 6332343, at *2 (N.D. Ga. Sept. 13, 2018)(granting motion for class certification in similar university 403(b) case and finding commonality satisfied); *Cunningham v. Cornell Univ.*, No. 16-CV-6525 (PKC), 2019 WL 275827, at *5 (S.D.N.Y. Jan. 22, 2019) (same); *Clark v. Duke Univ.*, No. 1:16-CV-1044, 2018 WL 1801946, at *5 (M.D.N.C. Apr. 13, 2018).

member. Because Defendant owed identical fiduciary duties to all members of the class and took actions at the Plan level, commonality is satisfied.

### 3.    Typicality

The "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Where the class members "share the same theories of liability," typicality is present even though "some theories about damages may differ." *Bertulli v. Independent Ass'n of Continental Pilots,* 242 F.3d 290, 297 (5th Cir. 2001). Here, the claims of all Plan participants share the same essential characteristics: they arise from a single course of conduct and assert the same legal theories: breaches of fiduciary duties owed to the Plan and all participants. Courts in other ERISA cases involving defined-contribution plan fees and investments "have overwhelmingly found typicality satisfied in similar circumstances."[9]

The same reasoning applies here. Plaintiff and all class members are bringing the same claims under the same legal and remedial theory: enforcement through § 1132(a)(2) of Defendant's obligation under § 1109(a) to make good to the Plan all losses caused by Defendant's breaches of duty and to obtain appropriate equitable relief. Because Defendant's actions were directed to and affected the

---

[9] *Munro v. Univ. of S. Cal.*, No. 16-6191, 2019 WL 7842551, at *5 (C.D. Cal. Dec. 20, 2019), *Rule 23(f) pet. denied*, No. 20-80001 (9th Cir. Feb. 27, 2020). Because such claims arise from the fiduciaries' "management of the Plans" and seek to recover for "injury to the Plans," the named plaintiffs' claims are "identical to those of all putative class members and implicate identical injuries and course of conduct." *Id.*; *Cassell v. Vanderbilt Univ.*, No. 16-2086, 2018 WL 5264640, at *5 (M.D. Tenn. Oct. 23, 2018) (finding typicality satisfied because the claims of all participants "arise from the same alleged misconduct" and "are based upon the same legal theories concerning alleged breaches of fiduciary duties.").

entire Plan, the claims of Plaintiff and class members arise from the same events and course of conduct. The alleged misconduct indisputably occurred at the Plan level, thereby affecting all Plan participants. Each class member would have to rely on the same evidence to prove Defendant breached its duties, committed prohibited transactions, and caused losses to the Plan.

### 4.    Adequacy

Plaintiff "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement ensures that there are no potential "conflicts of interests between the named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Simply put, there is no doubt that Plaintiff is adequate to serve as class representative. She has already assisted with the discovery process, reviewed and approved critical documents in this case, has been readily available to answer questions, completed Defendant's extensive written discovery requests, and been deposed in person by Defendant's counsel in Orlando, Florida. She is an exemplary class representative.

As demonstrated by her attached sworn Declaration (Ex. C), Plaintiff's interests are aligned with the class members' interests because she is acting on behalf of the Plan in seeking to enforce the fiduciary duties that Defendant owed to the Plan and to recover damages and equitable relief that are due to the Plan. *See* 29 U.S.C. §1109(a). Because Plaintiff is pursuing claims on behalf of the Plan, there are no conflicts between Plaintiff's individual interests and the interests of the class. To the contrary, the Plaintiff and all class members share the same

objectives, share the same factual and legal positions, and share the same interest in establishing Defendant's liability. *See In re Delta/AirTran Baggage Fee Antitrust Litigation*, 317 F.R.D. 675, 680 (N.D. Ga. 2016). Additionally, a class representative needs only a basic understanding of the claims and a willingness to participate in the case.

Rule 23(g) also provides factors for the Court to assess in appointing class counsel: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. Civ. P. 23(g). Plaintiff's counsel has substantial experience in prosecuting ERISA fiduciary breach class actions such as this. Mr. Cabassa is Board Certified in Employment Law by the Florida Bar, while Mr. Hill has litigated approximately 600 federal cases here in the Middle District of Florida alone. Mr. Cabassa and Mr. Hill have been named class counsel in approximately 50-60 different class action cases in the Middle District of Florida. (Ex. D, Ex. E).

Counsel for Plaintiff retained two industry experts to help craft the Complaint in this case. They have served discovery and are in the process of obtaining more discovery to advance the claims in this case. Plaintiff's counsel has a demonstrated track record of success. Plaintiff satisfies the adequacy requirement.

**B.**    **Rule 23(b) is Satisfied**

Rule 23(b)(1)(A) "takes in cases where the [defendant] is obligated by law to treat the members of the class alike" or "must treat all alike as a matter of practical necessity." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 614 (1997) (citation omitted). Here, Defendant owes fiduciary duties to the Plan, and thus to all participants, and hence all class members. *See* 29 U.S.C. § 1104(a)(1). In discharging those duties, Defendant was obligated to treat all participants (and all class members) alike.

Allowing thousands of individuals to pursue separate actions on behalf of the Plan could result in varying adjudications on numerous issues, resulting in conflicting and incompatible standards of conduct for Defendant. As noted, to resolve Plaintiff's claims, the factfinder must determine whether Defendant used prudent methods to monitor compensation and investments, whether the fees and investments were reasonable and prudent, and the proper benchmarks to measure Plan losses. Such conflicting orders in "thousands of separate individual actions" would put Defendant in the "untenable" position of being subject to "differing standards of duty and, thus, differing standards of conduct," thereby leaving Defendant "in limbo" and "making compliance impossible." *Shanehchian v. Macy's, Inc.*, No. 07-828, 2011 WL 883659, *9 (S.D. Ohio Mar. 10, 2011). For all the foregoing reasons, Plaintiff respectfully requests the Court grant this Motion.

DATED this 19th day of May, 2025.

Respectfully submitted,

/s/ Brandon J. Hill
**BRANDON J. HILL**
Florida Bar Number: 37061
**LUIS A. CABASSA, P.A.**
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK**
Florida Bar Number: **0285020**
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Direct: 813-337-7992
Main: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

*Attorneys for Plaintiff and the Proposed
Class*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 19th day of May, 2025, the foregoing was electronically filed with the Clerk of Court via the CM/ECF system. I further certify that a true and correct copy of the foregoing document will be served with the Complaint.

/s/ Brandon J. Hill
**BRANDON J. HIL**